Lori E. Andrus (SBN 205816)
Micha Star Liberty (SBN 215687)
Jennie Lee Anderson (SBN 203586)
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylaw.com
micha@libertylaw.com
jennie@libertylaw.com

Barry W. Walker
Jeffery A. Whitney
WALKER WHITNEY LLC
Two 20th Street North, Suite 1320
Birmingham, Alabama 35203
Telephone: (205) 252-2770
Facsimile: (205) 252-2119
barry@bwwlawllc.com
jwhitney@jwhitneylaw.com

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA TAYLOR, on behalf of herself and all others similarly situated, | Civil Case No.: '07 CV 1732 JAH JMA |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT** |
| ACCREDITED HOME LENDERS, INC., and ACCREDITED HOME LENDERS HOLDING COMPANY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Dana Taylor ("Plaintiff") brings this action against Accredited Home Lenders, Inc. ("Accredited") and Accredited Home Lenders Holding Company ("Holding Company") (collectively, "Accredited" or "Defendants"), on behalf of herself and all others similarly situated, and alleges on information and belief as follows:

CLASS ACTION COMPLAINT

## INTRODUCTION

1. This is a class action brought by Plaintiff, on behalf of herself and other similarly-situated African American homeowners, under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"). Plaintiff seeks remedies for herself and the Class (defined in ¶ 49, below) for the discriminatory impact of Defendants' home financing policies and practices.

2. Defendants have established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the "Discretionary Pricing Policy," authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate. In other words, after Defendants determine a finance rate acceptable to them using objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), the Defendants' credit pricing policy then authorizes additional discretionary financing charges and interest mark-ups. These subjective finance charges have a widespread discriminatory impact on African American applicants for home mortgage loans, in violation of ECOA and the FHA.

3. Plaintiff seeks declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from African American homeowners.

## THE PARTIES

4. Plaintiff Dana Taylor is an African American homeowner who resides at 813 Treymoore Lake Court, Alabaster, Alabama 35007.

5. Defendant Accredited Home Lenders, Inc., the principal operating subsidiary of Accredited Home Lenders Holding Company, is a mortgage lender incorporated under the laws of the State of California, with its principal place of business at 15253 Avenue of Science, San Diego 92128.

6. Defendant Accredited Home Lenders Holding Company is a Delaware corporation, with its principal place of business at 15253 Avenue of Science, San Diego 92128.

## JURISDICTION AND VENUE

7. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction in a civil action arising under federal law. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful discriminatory practice is alleged to have been committed in this District, and Defendants regularly conduct business in this District, and Defendants maintain their principal place of business in this District.

## FACTUAL ALLEGATIONS

8. The lending industry has a long history of engaging in racial discrimination in connection with mortgage loans made to African Americans, with products and terms that are drastically worse than those given to their similarly-situated Caucasian counterparts. Recently, the Federal Reserve Board concluded that African Americans were more likely to pay higher prices for mortgages than their Caucasian counterparts. The United States Inspector General cited that report as showing "significant" differences, making it "clear" that African Americans were "much more likely to get higher-priced loans" than Caucasians. See http://federalreserve.gov/boarddocs/testimony/2006/20060613/default.htm.

9. According to Harvard's Joint Center for Housing Studies, African Americans are more than five times as likely as Caucasians to be put into an equity-draining "sub-prime" loan – a higher-cost mortgage product that is theoretically given to borrowers who have impaired credit – than their Caucasian counterparts. See http://www.jchs.harvard.edu/publications/finance/w05-11.pdf. This is so, in part, because the sub-prime industry has attempted to maximize its profits by directing borrowers with relatively good credit to sub-prime mortgages. These predatory tactics have been disproportionately applied against members of the African American community.

10. According to Federal Reserve data, the majority of African Americans who took out mortgages in 2005 were put into higher-cost sub-prime loans, compared with about 17% of Caucasians. See http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf. This is consistent with the Association of Community Organizations for Reform Now ("ACORN") finding in 2001 that among upper-income African Americans nationally, 18.05% of

- 3 -

conventional refinance loans received were from sub-prime lenders, whereas for upper-income Caucasian homeowners it was only 4.7%. See http://www.acorn.org/index.php?id=574&L=0. In fact, upper-income African American homeowners are more likely to receive a sub-prime loan while refinancing even when compared to lower-income Caucasian homeowners. Id.

11. While some borrowers in the sub-prime market are genuine credit risks, many African American borrowers have been targeted and illegally steered into sub-prime loans. Defendants are reluctant or refuse to offer these borrowers the prime loans that are offered to Caucasian borrowers with the same qualifications. Instead, Defendants engage in predatory sub-prime lending, knowingly make loans with high loan-to-value ratios, to borrowers who qualify for lower-cost or prime loans. Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive sub-prime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers.[1] This effectively dilutes the equity from the property, places the borrower in jeopardy of default, and puts the borrower in the position of spending years paying off additional loan balances without developing any equity.

12. Earlier this year, over 80 consumer groups wrote to Federal Banking Agencies about a particular type of sub-prime loan, the adjustable rate mortgage ("ARM"). See http://www.consumersunion.org/pdf/Non-trad-guidance207.pdf. An ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment shock may be as high as 48%. The majority of sub-prime loans made to African Americans had these adjustable rates, called 2-28 or 3-27 ARMs. The Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or will end in foreclosure, a rate of 19%. See http://www.responsiblelending.org/issues/mortgage/reports/page.jsp?itemID=31214551.

13. The U.S. Department of Housing and Urban Development ("HUD") found that in neighborhoods where at least 80 percent of the population is African American, borrowers

---

[1] Freddie Mac, *Automated Underwriting: Making Mortgage Lending Simpler and Fairer for America's Families* (September 1996), chapter 5 (available at http://www.freddiemac.com/corporate/reports/moseley/mosehome.htm).

- 4 -

CLASS ACTION COMPLAINT

were 2.2 times as likely as borrowers in the nation as a whole to refinance with a sub-prime lender. See http://www.responsiblelending.org/index.html. In fact, upper-income borrowers living in predominately African American neighborhoods are twice as likely as lower-income Caucasian borrowers to have sub-prime loans. See http://www.huduser.org/publications/pdf/brd/13Fishbein.pdf. Accordingly, the Secretary of HUD, Alphonso Jackson, was recently quoted as stating he believes African Americans have been specifically targeted by sub-prime lenders. See http://www.nedap.org/pressroom/documents/2007-June-13_Bloombergv2.pdf.

14. In addition to carrying higher interest rates, sub-prime loans to African Americans are typically laden with insufficiently disclosed fees and excessive prepayment penalties which effectively prohibit borrowers from refinancing at a fairer rate. The Center for Responsible Lending estimates that families lose $2.3 billion each year from their home equity wealth because of prepayment penalties in sub-prime mortgage loans. See http://www.responsiblelending.org/pdfs/ib008-PPP_in_Subprime_Loans-0604.pdf.

15. While long suspected, this discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act ("HMDA"). The Center for Responsible Lending performed a study using this data and a custom software program to analyze over 177,000 individual loans, culminating in a May 31, 2006 report entitled "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages." http://www.responsiblelending.org/issues/mortgage/reports/page.jsp?itemID=29371010. This review combined self-reporting data directly from the lenders, with a proprietary loan-level database that was able to account for and exclude specific risk profiles. Even after accounting for risks, "large and statistically significant" disparities remained:

- On fixed-rate loans, African Americans are 31% to 34% more likely to receive a higher-rate loan than if they had been Caucasian. Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African American mortgagees.

1      • On adjustable-rate loans, African Americans are up to 15% more likely to receive a higher-rate loan than if they had been Caucasian.

These disparities can only be explained by race.

16. In another study, the National Community Reinvestment Coalition determined that lending institutions in six major metropolitan areas engaged in "pervasive discriminatory and predatory practices," including making high cost sub-prime loans to higher-qualified African Americans 54% of the time, compared to 23% of the time for Caucasians, even when Caucasian applicants were similarly, and often less, qualified. See http://www.ncrc.org/policy/analysis/policy/2007/Committee_Hearing_April_17.pdf.

17. The disparities are particularly pronounced in the Birmingham metropolitan area. According to a study of HMDA data conducted by ACORN, Birmingham ranks third among U.S. cities in the number of high-costs loans, with 32.4% of loans made to African Americans high-cost loans, compared to 8.7% of those made to whites. See http://acorn.org/index.php?id=9758&L=0%2Findex.php%3Fid%3D42001. Birmingham ranked second nationally in high-cost refinance loans made to blacks, with 67% of the 2,117 loans in 2004 considered high cost. Id.

18. Even after African American applicants manage to secure financing for their homes, they are often subjected to other abusive practices by their lenders, including the failure to provide timely and complete adverse action notices, in violation of 15 U.S.C. § 1691(d). The culmination of all of these discriminatory practices results in foreclosures for African American homeowners more frequently than for similarly-situated Caucasians.

19. These statistical disparities are not mere happenstance, but instead result from a systematic and predatory targeting of African Americans. African American and Caucasian borrowers with the same qualifications should be treated equally. Instead, Defendants have discriminated against the African American homeowners through several discriminatory practices, including their Discretionary Pricing Policy, described below.

**Accredited's Discretionary Pricing Policy**

- 6 -

CLASS ACTION COMPLAINT

20. According to its website, Accredited is "engaged in the business of originating, financing, securitizing, servicing, and selling residential mortgage loans that do not conform to the credit or other criteria established by Fannie Mae and Freddie Mac." See http://investors.accredhome.com/phoenix.zhtml?c=132116&p=irol-homeProfile. On August 22, 2007, Accredited announced that it would no longer be accepting new loan submissions for approval. See http://www.accredhome.com/?Section=8&Main=0.

21. During the relevant time period, Accredited offered home mortgage loans directly to consumers, including sub-prime loans. Accredited also funds home mortgage loans arranged by its network of mortgage brokers, who are agents of Accredited. Accredited's loans are made in reliance on Accredited's credit-granting policies and with the participation of Accredited.

22. Accredited provides authorized mortgage brokers with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensating mortgage brokers who arranged business for it.

23. Accredited authorizes mortgage brokers who had to sign a contract with it to accept applications on its behalf, quote financing rates and terms on it (with limitations set by Accredited), inform credit applicants of Accredited's financing options and originate finance transactions using Accredited's forms, in accordance with its policies.

24. In all of the home mortgage finance transactions at issue, Accredited advances the funds to make the loans and bears some or all of the risk of default. Accredited provides its brokers with credit applications, loan contracts and other required financing forms, as well as instructions on filling out such documents necessary to complete home mortgage transactions.

25. After a customer provides credit information to one of Accredited's brokers, Accredited computes a financing rate through an objective credit analysis that, in general, discerns the creditworthiness of the customer.

26. These credit analyses consider numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies,

- 7 -

automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt to-income ratios, loan-to-value ratios and other risk-related attributes or variables. Accredited uses these variables to determine a "mortgage score" for each credit applicant.

27. Based on these objective risk-related variables and the resulting mortgage score, Accredited derives a risk-based financing rate at which it would provide a home mortgage, often called the "Par Rate." Alternatively, experienced Accredited loan officers and brokers estimate the risk-related Par Rate by referring to the applicant's credit bureau-determined credit score.

28. The applicable Par Rates and authorized discretionary charges are communicated by Accredited to its brokers via regularly published "rate sheets." Such rate sheets are published by Accredited via intranet and internet.

29. Although Accredited's initial analysis applies objective criteria to calculate this risk-related Par Rate, Accredited then authorizes a subjective component in its credit pricing system – the Discretionary Pricing Policy – to impose additional non-risk charges. Brokers have discretion, within the limits set by Accredited, to impose discretionary mark-ups as additional points in interest – "a rate mark-up." When there is a rate mark-up, Accredited shares the additional income with the broker.

30. The discretionary charges are paid by the customer as a component of the total finance charge (the "Contract APR"), without the homeowner knowing that a portion of their Contract APR was a non-risk-related charge.

31. Accredited's Discretionary Pricing Policy, by design, causes persons with identical or similar credit scores to pay different amounts for the cost of credit. As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate are undermined and the potential for race bias becomes inherent in the transaction.

32. The Discretionary Pricing Policy, although facially-neutral (insofar as Accredited uses the same or effectively the same policy for all credit applicants), has a

- 8 -

disproportionately adverse effect on African Americans compared to similarly-situated Caucasians in that African Americans pay disparately more discretionary charges (both in frequency and amount) than similarly-situated Caucasians. Statistical analysis of discretionary charges imposed on African American and Caucasian customers of other mortgage companies that use credit pricing systems structured like that of Accredited has revealed that African Americans, after controlling for credit risk, are substantially more likely than similarly-situated Caucasians to pay such charges.

33. Accredited's mortgage brokers are agents of Accredited for the purpose of setting credit price, which is set based on Accredited's policy.

34. The disparate impact suffered by African American homeowners is a direct result of Accredited's Discretionary Pricing Policy in that Accredited designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

35. Accredited has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally-protected classes, such as African Americans. Despite having such a non-delegable duty, Accredited has chosen to use a commission-driven, subjective pricing policy that it knows or should have known has a significant and pervasive adverse impact on African American homeowners.

36. The disparities between the terms of Accredited's transactions involving African American homeowners and the terms involving Caucasian homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

37. There are no legitimate business reasons justifying Accredited's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

**Plaintiff Dana Taylor**

38. Plaintiff Dana Taylor owns her own home in Alabaster, Alabama, where she lives with her three children, ages 11, 16, and 19.

39. In June 2005, when Ms. Taylor was seeking financing to purchase her home, she met with Ms. Laurice Scott of Integrity First Mortgage. Ms. Taylor met with Ms. Scott on several occasions (in person and telephonically) to discuss the terms of financing. Ms. Scott recommended Accredited Home Lenders, Inc. as an appropriate lender.

40. On July 29, 2005, Ms. Taylor entered into a mortgage transaction with Accredited, and arranged by Integrity First Mortgage. The transaction was divided into two loans.

41. The larger loan (Loan No. 0507224173) was a 30-year, 2-28 adjustable rate loan with a disclosed APR of 9.9343%. The loan amount was $100,000.00.

42. According to the HUD-One Settlement Statement, Ms. Taylor paid $6,341.04 in settlement charges in connection with the larger loan, including a 3.3485%, or $3,348.49, loan origination fee; a $500.00 processing fee; a $35 Credit Report Fee; a .750%, or $750.00, yield spread premium; and a $414.00 underwriting fee.

43. The smaller loan (Loan No. 0507224174), which had a loan amount of $25,000, was a 15-year fixed rate loan with a balloon feature, providing for a final payment of $21,048.11. The disclosed APR of the smaller loan was 11.432%.

44. According to the HUD-One Settlement Statement, in relation to the smaller loan, Ms. Taylor paid a 2.7040%, or $676.00, loan origination fee and a $214.00 underwriting fee.

45. Unbeknownst to Ms. Taylor, the contract APR on the mortgage loans was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to Defendants' Discretionary Pricing Policy.

46. On information and belief, Ms. Taylor was subject to Defendants' Discretionary Pricing Policy.

47. On information and belief, Ms. Taylor was charged a disproportionately greater amount in non-risk-related credit charges than similarly-situated Caucasian persons.

48. At some time after the mortgage closing date, Accredited assigned, sold or transferred the mortgage loans to HomEq Servicing (Loan No. 0507224173) and Wilshire Credit Corporation (Loan No. 0507224174).

## CLASS ACTION ALLEGATIONS

49. Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure. This action satisfies the ascertainability, numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

### The Class:

All Black or African American consumers who obtained an Accredited home mortgage loan in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period") and who were subject to Accredited's Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan.

50. Excluded from the Class are (1) Defendants, any entity or division in which Defendants have a controlling interest, and its/their legal representatives, officers, directors, assigns and successors; (2) the judge to whom this case is assigned and any member of the judge's immediate family; and (3) claims for personal injury, wrongful death and emotional distress and claims of consequential property damage and loss.

51. The phrase "Black or African American" refers to the definition used in the 2000 United States Census.

52. The phrase "Discretionary Pricing Policy" refers to Accredited's policy of authorizing its network of mortgage brokers to impose subjective, discretionary charges and interest mark-ups as a part of the finance charges on the loans they originate.

53. <u>Numerosity</u>: Plaintiff does not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendants. Plaintiff, however, believes that the Class encompasses many hundreds or thousands of individuals who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

54. <u>Ascertainability</u>: The Class is composed of an easily ascertainable, self-identifying set of African American persons who obtained an Accredited home mortgage loan. Moreover, Class members are easily identifiable from records maintained by, and in the possession and control of, the Defendants.

55. <u>Commonality/Predominance</u>: All members of the Class have been subject to and affected by the same Discretionary Pricing Policy. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to:

    a.    the nature, scope and operations of Defendants' Discretionary Pricing Policy;

    b.    whether Defendants are creditors under ECOA because, for example, in the ordinary course of its business they participate in the decision of whether or not to extend credit to consumers;

    c.    whether Defendants' Discretionary Pricing Policy is a facially-neutral credit pricing system that has affected racial discrimination in violation of ECOA and the FHA;

    d.    whether there are statistically-significant disparities between the amount of the discretionary charges imposed on African American homeowners and the amount of the discretionary charges imposed on Caucasian persons that are unrelated to creditworthiness;

    e.    whether any legitimate business reason for the Discretionary Pricing Policy can be achieved by a credit pricing system less discriminatory in its impact;

    f.    whether the Court can enter declaratory and injunctive relief; and

    g.    the proper measure of disgorgement or damages.

56. <u>Typicality</u>: The claims of the named Plaintiff are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiff and the other members of the Class were subjected to the same Discretionary Pricing Policy that has disproportionately affected African American homeowners.

57. <u>Adequacy</u>: The named Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff is committed to the vigorous prosecution of the Class's claims and has retained attorneys who are qualified to pursue this litigation and have experience in class

actions – in particular, consumer protection and discrimination actions, including actions against automobile financing companies for similar discriminatory subjective mark-up practices. Neither Plaintiff nor her counsel has any interest adverse to those of Class members.

58. <u>Superiority</u>: A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

59. In the alternative, Defendants have acted or refused to act on grounds generally applicable to the case, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTE OF LIMITATIONS

60. Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by Accredited, have been found to produce significant discriminatory effects. Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated throughout the financing industry for several years, particularly since 1994, as a result of numerous high profile actions by the United States Department of Justice and federal regulatory agencies.

61. Accredited has known or should have known that its credit pricing system causes African American homeowners to pay more for mortgage financing than the amounts paid by Caucasian customers with identical or effectively-identical credit scores. The following regulatory settlements involved discriminatory pricing policies structurally similar to Accredited's Discretionary Pricing Policy and were widely reported:

- <u>United States v. Blackpipe State Bank</u>, Civ. Act. No. 93-5115 (D.S.D. filed November 16, 1993) (charging Native Americans higher interest rates)
- <u>United States v. First National Bank of Vicksburg</u>, No. 5:94 CV 6(B)(N) (S.D. Miss. filed January 21, 1994) (charging African Americans higher interest rates)
- <u>United States v. Huntington Mortgage Co.</u>, No. 1; 95 CV 2211 (N.D. Ohio filed October 18, 1995) (charging African Americans higher fees)

- 13 -

- <u>United States v. Security State Bank of Pecos</u>, No. SA 95 CA 0996 (W.D.Tex. filed October 15, 1995) (charging Hispanics higher interest rates)

- <u>United States v. First National Bank of Gordon</u>, No. CIV-96-5035 (D.S.D. filed April 15, 1996) (charging Native Americans higher interest rates)

- <u>United States v. Fleet Mortgage Corp.</u>, No. 96-2279 (E.D.N.Y. filed May 7, 1996) (charging African Americans and Hispanics higher interest rates)

- <u>United States v. Long Beach Mortgage Co.</u>, No. CV-96-6159 DT (CWx) (C.D. Cal. Filed September 5, 1996) (charging African Americans, Latinos, women and persons over age 55 higher interest rates)

62. Despite the fact that Accredited knew or should have known of the discriminatory effect of its Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates are subjective and not based solely on risk-related characteristics.

63. Despite the creation and distribution of Accredited financing documents that falsely foster the image that Accredited offers competitive rates that are objectively set, Accredited never discloses the truth to its credit applicants concerning the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles; and (b) that it has authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners.

64. Due to the inherent nature of the Accredited's undisclosed Discretionary Pricing Policy and due to Accredited's deception and concealment, Accredited's African American customers have no way of knowing or suspecting: (a) the existence of Accredited's subjective credit pricing policy; (b) that they were charged additional subjective credit charges; or (c) that they were charged a disproportionately greater amount for their cost of credit than similarly-situated Caucasian persons.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
Violation Of The Equal Credit Opportunity Act – 15 U.S.C. § 1691, *et seq.*

65. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

- 14 -

66. Accredited is a creditor as defined in ECOA, and, in the ordinary course of its business, participated in the decision of whether or not to extend credit to Plaintiff and Class members.

67. Accredited designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein (the Discretionary Pricing Policy) which has had a disparate economic impact on African American homeowners compared to similarly-situated Caucasians.

68. All actions taken by Accredited's employees and brokers were in accordance with the specific authority granted to them by Accredited and were in furtherance of Accredited's policies and practices.

69. As a result of Accredited's Discretionary Pricing Policy, Accredited has collected more in finance charges from African American homeowners than from similarly-situated Caucasian persons for reasons totally unrelated to credit risk.

70. Accredited's Discretionary Pricing Policy violates ECOA and constitutes actionable discrimination on the basis of race.

71. Plaintiff and Class members are aggrieved persons as defined in ECOA by virtue of having been subject to Accredited's discriminatory Discretionary Pricing Policy.

### SECOND CLAIM FOR RELIEF
### Violation Of The Fair Housing Act – 42 U.S.C. §3601, *et seq.*

72. Plaintiff incorporates by reference the allegations contained in preceding paragraphs of this Complaint.

73. Accredited engaged in residential real estate-related transactions with respect to Plaintiff and Class members.

74. Accredited's Discretionary Pricing Policy has resulted in discrimination with respect to Plaintiff and Class members.

75. As a result of Accredited's Discretionary Pricing Policy, Accredited has collected more in finance charges from African American homeowners than from similarly-situated Caucasian persons for reasons totally unrelated to credit risk.

76. Accredited's Discretionary Pricing Policy violates the FHA and constitutes actionable discrimination on the basis of race.

77. Plaintiff and the Class are aggrieved persons as defined in the FHA by virtue of having been subject to Accredited's discriminatory Discretionary Pricing Policy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the members of the Class, demands judgment against Defendants as follows:

1. An order certifying the proposed Class and any appropriate subclasses and designating Plaintiff as Class Representative and her counsel as class counsel;

2. A declaration that, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613, the acts and practices of Defendants complained of herein are in violation of ECOA and the FHA;

3. A permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining the Defendants, and the Defendants' agents and employees, affiliates and subsidiaries, from continuing to discriminate against Plaintiff and the members of the Class because of their race through further use of the Discretionary Pricing Policy or any non-risk related discretionary pricing policy employed by Defendants and retain jurisdiction to ensure and, where necessary, enforce compliance with the injunction;

4. An order directing Defendants, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its network of mortgage brokers to prevent discrimination;

5. An order directing Defendants, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

6. A declaration, pursuant to 15 U.S.C. § 1691e(c), that Defendants must disgorge, for the benefit of the Class, all or part of its ill-gotten profits it received from imposing

1 | disproportionate non-risk charges on African American homeowners pursuant to Defendants'
2 | Discretionary Pricing Policy; and an order directing the equitable distribution of such charges, as
3 | restitutionary relief, to all appropriate Class members;

4 |     7.    Actual and punitive damages to the Plaintiff and Class members pursuant
5 | to 42 U.S.C. § 3613(c);

6 |     8.    Attorneys fees and costs, including but not limited to cost of experts,
7 | pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. § 3613(c); and

8 |     9.    Other and further relief as this Court finds necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demands a jury trial in this action for all of the claims so triable.

Dated: August 31, 2007

_____
Lori E. Andrus

Lori E. Andrus
Micha Star Liberty
Jennie Lee Anderson
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylawoffice.com
micha@libertylawoffice.com
jennie@libertylawoffice.com

Barry W. Walker
Jeffery A. Whitney
WALKER WHITNEY LLC
Two 20th Street North, Suite 1320
Birmingham, Alabama 35203
Telephone: (205) 252-2770
Facsimile: (205) 252-2119
barry@bwwlawllc.com
jwhitney@jwhitneylaw.com

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

FILED

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

07 AUG 31 PM 4:32

I (a) PLAINTIFFS  Dana Taylor, on behalf of herself and all others similarly situated

DEFENDANTS  Accredited Home Lenders, Inc., and Accredited Home Lenders Holding Company,

BY: San Diego DEPUTY

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Shelby, AL
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Lori E. Andrus   415-896-1000
Andrus Liberty & Anderson LLP
1438 Market St.
San Francisco, CA 94102   (see attachment)

ATTORNEYS (IF KNOWN)

'07 CV 1732   JAH JMA

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☒4 |
| Citizen of Another State | ☒2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

15 U.S.C. 1691 (Equal Credit Opportunity Act) and 42 U.S.C. §3601

V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
|  | PERSONAL INJURY | PERSONAL INJURY |  |  |  |
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability |  | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act |  |  | ☐ 625 Drug Related Seizure of Property 21 USC881 | PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability |  | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine |  | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 650 Airline Regs | SOCIAL SECURITY | ☐ 810 Selective Service |
|  |  | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 862 Black Lung (923) |  |
|  | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | LABOR | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ 160 Stockholders Suits |  |  | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability |  |  | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | FEDERAL TAX SUITS | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
|  |  |  | ☐ 740 Railway Labor Act |  | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment |  | ☐ 791 Empl. Ret. Inc. Security Act |  |  |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General |  |  | ☐ 950 Constitutionality of State |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  |  | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other |  |  |  |
| ☐ 290 All Other Real Property |  | ☐ 550 Civil Rights |  |  |  |
|  |  | ☐ 555 Prisoner Conditions |  |  |  |

VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appelate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

VII. REQUESTED IN COMPLAINT:  ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $ Undetermined   Check YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO

VIII. RELATED CASE(S) IF ANY (See Instructions):  JUDGE Andrew Guilford   Docket Number 8:2007cv00794

DATE August 31, 2007   SIGNATURE OF ATTORNEY OF RECORD  [signature]

#142058  $350  Kb  8/31/07

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

Attachment to Civil Case Cover Sheet
As referenced in Section I (c)

I (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Lori E. Andrus (SBN 205816)
Micha Star Liberty (SBN 215687)
Jennie Lee Anderson (SBN 203586)
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylawoffice.com
micha@libertylawoffice.com
jennie@libertylawoffice.com

Barry W. Walker
Jeffery A. Whitney
WALKER WHITNEY LLC
Two 20th Street North, Suite 1320
Birmingham, Alabama 35203
Telephone: (205) 252-2770
Facsimile: (205) 252-2119
barry@bwwlawllc.com
jwhitney@jwhitneylaw.com

ATTACHMENT TO CIVIL CASE COVER SHEET FOR *TAYLOR V. ACCREDITED HOME LENDERS, INC.*

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 142056    - KD

August 31, 2007
16:01:48

Civ Fil Non-Pris
USAO #.: CIVIL FILING; 07CV1732
Judge..: JOHN A HOUSTON
Amount.:                  $350.00 CK
Check#.: BC 036926

Total-> $350.00

FROM: TAYLOR V. ACCREDITED HOME LEND
      INC., ET AL
      CIVIL FILING